May it please the Court, I am John Thornton. I'm here with my partner, Kevin Blue, on behalf of the estate of Natale Giustina. We'd like to reserve some of our 15 minutes for summary. The clock counts down. We believe that there's clearly erroneous error in this decision by the tax court. The primary reason for that belief is the fact that the decedent owned a non-marketable minority interest as a limited partner in a partnership. And that in Oregon, anyone of hypothetical buyer that succeeds to that interest has a status only of an assinee. They do not have the right to vote on limited partnership matters, any partnership matters, and for that matter are relegated to the position of a mere stakeholder with entitlements to the proceeds from distributions from the partnership. Under Oregon law, it is clear that the individual that succeeded to that interest is an assinee only. Under the Giustina Land and Timber Company Agreement, which I'll refer to as GLTC from here forth, provided that only the general partners would have the right to determine whether they would admit an assinee as a partner. As such, it was a legal impossibility at the date of death for the individual that would succeed to the decedent's interest to even vote as a limited partner. Accordingly, being able to establish a coalition to remove the general partners or to terminate the partnership or to access the asset value of the partnership was a legal impossibility. In terms of the fact that the general partners stated that they were not likely to admit someone as a substitute limited partner, that doesn't mean at some time that that couldn't happen, but it was highly unlikely and it was not reasonably foreseeable that that would be an opportunity for the successor of ownership to the decedent's interest. We believe that the case ignored important valuation principles, Supreme Court law, the law of Oregon, and the partnership agreement of GLTC. The most important finding in the case, and I quote by the court, the Giustina family had a long history of acquiring and retaining timberlands. It was reasonable to conclude that the partnership would continue to maintain its timberlands without liquidation. That's the pivotal finding by the court. Unfortunately, they departed from that and they cited an obscure treatise that said that you should enter into guesses, assumptions, and speculation to determine what the future is. That's totally contrary to the law of the Supreme Court in the Olson case and also the Ithaca Trust case. Those cases quite clearly stand for the legal proposition that you are not entitled to make speculation in determining valuation. But your agreements do provide for a method by which there can be liquidation. I mean, it seems to be somewhat arguable how realistic it is, but there is an agreement in place which does offer the possibility that there could be liquidation. Why is it that they entered into that agreement, you know, that they have the right to get permission from the general partner, and then if they get two-thirds of the other folks to go along, they could force a liquidation? What was the purpose of all that? Well, I think the purpose actually was to follow state law. Even if the provision wasn't in the partnership agreement, Oregon state law was clear that anyone who succeeded to a partnership interest as an assignee, as was found in the Watts case, which was an Eleventh Circuit case, it was clear there wasn't that same provision in the Watts case. But in Watts, you did not have the same type of agreement, if I read that case correctly. Well, it didn't have the same. They didn't have the same type of agreement, but they were both governed by Oregon law. And Oregon law provides that you cannot become a partner until all of the partners agreed to admit you as an assignee. But am I correct that Watts only dealt with the issue that there was no liquidation as a matter of law by reason of the deceased's interest, that they could not liquidate, whereas here there is a mechanism, albeit you argue somewhat tenuous, that would allow for liquidation. How do you square these two cases? Well, if you take Watts, I think Watts and Justine are very comparable cases. First of all, the case cited that there would not be a liquidation was not caused by the death of either decedent in this case. There's the absence of an agreement, if I recall correctly, right? There was no agreement in Watts at all. Here you have some sort of an arrangement. Well, the Court referred to, again, the assignee status, and the Court also said that the partnership agreement in Watts gave indication that they would not intend to terminate the partnership. But they had the same rights. Make no mistake, it's a general partnership, and they could have gone to the other general partners and they could have voted to terminate the partnership if they were able to get a coalition, not of a two-thirds supermajority, as was the provision in the GLTC agreement, but under Oregon law, in Watts, they could have established a coalition, they could have got 51% of the people, and they could have terminated the partnership. Let me ask you this. It's a two-thirds requirement. Is it here, is it two-thirds of ownership or is it two-thirds of the people? Two-thirds of the limited partnership interest, Your Honor. So it's not person by person, it's two-thirds of the ownership? Well, it's of the limited partner interest. There's a number of supermajority, which is a clear indication of the fact that the family intended to continue this business until the termination of the partnership in 2040. All right. But what I'm looking at is that the percentage of the ownership here is actually fairly high. It doesn't take a lot more to get to two-thirds. It doesn't take a lot more, but it takes the vote. There are three families in Justina Land and Timber Company that were all heirs of the Justinas that started in 1917, had almost a 100-year record of acquiring and retaining timberlands. One of the families was Jim Justina's family members, who was elected general partner. The other was Larry Justina, who was a managing general partner family. And there was one third family that only owned 4.8 percent of the partnership. It's just unrealistic that a business that had started in 1990, had gone on for 15 years, had always not sold timberlands to make profits, but only had generated earnings, that somehow this coalition is going to occur. It's highly speculative. No, I get the argument. Let me come back to something that you said, that in terms of valuing this or assessing what value to attach to the possibility of an asset sale or a liquidation as distinct from just cash flow, you said, well, the IRS or the commissioner, the tax court can't speculate. Well, that may be right, but obviously a probabilistic determination is appropriate. So how do we differentiate between impermissible speculation and there's a decent chance, whether it's 25 percent or 50 percent or whatever it is, of liquidation such that it should be counted? Well, I think you make the distinction based on the facts of the case. So speculation means really improbable and probable means may well happen? I believe the tests that are set forth in Olson and Ithaca Trust, where it says it's reasonably foreseeable, are the proper tests, and I believe that it needs to be reasonably foreseeable on the date of death. The facts need to be. We have a family that started in 1917. We had heirs of that same family that formed a partnership in 1990. They had operated for 15 years. What's lost in the decision is the highly profitable nature and the excellent operations of this business. When it was formed, they owned 30,000 acres of timberland. In 15 years, they'd accumulated another almost 18,000 or 60 percent more timberlands than they owned at the time of formation. So let me ask you this, if I may. I may not be a valuation maven, so I apologize if I put my foot in my mouth right now, but I'm going to take a shot at it anyway. The value of this was the assets were sold. You have just convinced me that this is a valuable asset-dominated type of business. It's increased over the years. I think it's $140 million. The cash flow is $51 million. Would not, you know, a general partner say, look, you know, this thing is so asset-loaded right now. If we liquidate, I get $150 million compared to the $51 million cash flow. There seems to be a three-to-one type of proportionality here. Does that enter at all into the conceptual basis of what might be realistic here? Well, I think when you look at this, you have to look at the realistic possibility that there's going to be a liquidation. If you go back to Watts. But the assets are three times the value of the cash flow. I mean, would that not suggest that there might be a probability or a possibility of reasonable or that there could be liquidation? It's a wild speculation. It's a possibility. It's not a likely possibility. Let me ask you another question. You're not asking for a remand. You think that as a matter of law we should say that the estate expert's value should be accepted, I think, as an ongoing concern, right? Did he not take a 10% factor here for liquidation? I'm looking at his report right now. Did he not say 10% that he allocated for liquidation, or am I reading this wrong? No, it's wrong. It was $150 million value. But let's take the numbers for a second. In Watts, the going concern value was $2.5 million. The liquidation value was $17.7 million. Now, I just wonder what your expert said here on the issue of liquidation. I'm reading the record incorrectly that he said there's a 10% liquidation factor. What our excuse me, our expert? Yeah. What he was saying is he was saying that it's not likely, as the court found, that they were going to liquidate the company. And he did a present value analysis and found that there was only a 10% chance using present value because he felt, which was consistent with the record, that there was not going to be a liquidation until 2040 because he felt that there was going to be no coalition established. They had a game plan to continue to run the enterprise. There was no intention to liquidate. But it was a very profitable company based on just the price. He, nonetheless, described a 10% factor to it, did he not? Yes. Yes, he did. Well, how do you square that with your argument that this should be valued only as a going concern and liquidation doesn't enter into this at all? We don't make that argument, Your Honor. But your expert did, right? No, our expert did not. Our expert had four different components. One of them was the asset value, which is a liquidation approach. Right. He used two income approaches and he used cash flow approaches. He weighted those approaches based on the possibility that those types of valuation would occur. So all he was saying is I looked at this, I did a discounted cash flow for the value of the timber. It was going to increase. I increased it by 4%. I then looked at the present value of that and said that the most likely scenario, that's not speculative, is at the end of the day, in 2040, there's a possibility of a liquidation. And he said 10% at that time, right? He said 10%. 10% possibility of liquidation in 2040? Correct. And if that's so, should there be any possibility of liquidation factored into the value now for tax purposes? That's what he did by using the 10%, Your Honor. He was saying that I'm going to present value that back to current time, and that's why I'm placing a 10% value today because that's the value today of a liquidation 35 years in the future. And that's the valuation you then would rely on, so that in your view you're willing to accept a 10% possibility of liquidation in 2040? We're willing to take, if it's present valued, we're willing to look at that, but we also believe that the liquidation value was improperly computed by the court. When they looked at the liquidation value, which is stipulated to be $150 million, that's the valuation at the entity level. That was agreed to. That's stipulated. That does not determine the value of the decedent's non-marketable minority assignee interest. That's an entirely separate analysis. As Judge Laro, who's a tax court judge, and Shannon Pratt, who was the lead witness in the Watts case found, they said that when you're dealing with this, the absorption discount is separate. It's at the entity level. The marketability and lack of control discounts are at the individual level. Yeah, no, I got that. We're going to take you over time, but don't worry. We'll give you a chance to respond. Let me ask you this. Watts comes up in a different posture than this case. In Watts, we had a decision of the tax court that the commissioner was challenging, and the Eleventh Circuit affirmed what the tax court had done. Here, you're asking us to overturn what the tax court had done. Does that change? Does that affect in any way how relevant Watts might be as a precedent for this case? Well, I think it's highly relevant. Unfortunately, if it were not for the rules of the appeals court, it would have been a Ninth Circuit case because the- No, no, I'm not concerned about Eleventh versus Ninth. What I'm concerned about is in Watts, there was a decision by the tax court that was affirmed by the court of appeal. Thus, all the deference that goes to a decision of the tax court was in play. Here, you're asking us not to affirm the tax court but to overturn it. And we are because we believe that the court, after it found that it was reasonable that there was not going to be a liquidation and they were continue to continue, that they put a 25 percent value on the liquidation value without properly discounting that value- Yeah, no, no, I got that. Okay. At the level. And they didn't look at the present value. They didn't look at the reality of the fact that no liquidation was likely to occur to 2040. Who knows what Timmer's going to be worth in 2040. But again, this is a very good company based merely on its earnings. It was distributing $4.5 to $5 million a year. It had no debt. It was very well positioned to move into the future and it had excellent cash flow. Okay. We've got that. You're now over. Let's hear from the government, but we will give you a chance to respond. Thank you, Your Honor. Yeah. May it please the Court, my name is Terry Milton representing the Commissioner. At the risk of sounding a little disjointed, I'd like to respond- If you could speak up, please. I'm sorry. I'm afraid I'm going to sound a little disjointed, but I'd like to respond to several things that came up during the appellant's argument. For one thing, to clarify the record, the taxpayer's expert gave a 10 percent weighting to something that he called an asset accumulation value, which is what they call, well, what has been referred to as a liquidation value, which I'd like to get away from. I'd like to call it an asset value because a liquidation value implies some kind of a distress sale or something like that, which is not the way it was valued as an asset valuation. But he assigned a 10 percent weight to that, but he admitted or conceded in his testimony that it wasn't really an asset valuation method. It was more like a cash flow method because what it did was project future amounts and then discount them to present value. So even though he had that 10 percent amount there, he never really stipulated to giving any weight at all to the asset value, which is what I understand the taxpayer to be arguing, that no weight should be given to the asset value of this very valuable partnership operation. Another thing that came up is the notion that what we're dealing with here is an assignee interest. Whatever Oregon law says about what happened to the decedent's partnership interest, for tax purposes, what's being valued here is a limited partnership interest. Now, if it didn't acquire, if it didn't have voting rights after it was acquired by some transferee or assignee, that would have an effect on the value of it, say a lack of control discount or something like that. But it's still a partnership interest. If they want to talk about it as an assignee interest, it raises a whole different question. They've never called it that prior to this appeal. That was not the way it was postured in the trial court. If an interest, there's a provision in the Internal Revenue Code, Section 2704, that says if a partnership interest is transferred without its voting rights, then there's the value of that quantum of the partnership interest is treated as a gift or as a transfer that's includable in the gross estate of the decedent. So if they were going to claim this was an assignee interest, it would have implications for them, and they have never done that until during the course of this appeal. Sotomayor's Court, in terms of how it came to this 25 percent liquidation or however you want to refer to it factor, in light of this kind of strange agreement where you have to get the consent of the general partner and then you have to get, you know, two-thirds of the people to get together to take control, if the business, then you can gang up against the general partner and force a liquidation, I don't understand how that adds up to this 25 percent factor. Maybe you can explain that to me. Well, Your Honor, I think we all have to agree that to some extent there's a judgment going on on the part of anybody who tries to value property. And the tax court arrived at that number by saying something similar to what you said, that there is some likelihood that at some point members of this partnership might prefer the asset value to the ongoing cash value. But 25 percent likelihood? I mean, it seems like such an abstract concept of combinations of things that have to happen before this can be achieved. Well, I believe all that has to happen is that a certain number of the descendants of this family should decide that they would like to see some cash out of the operation more than they are. You have to get permission from one of the, I guess, two general partners to allow this outsider to come in, right? I'm sorry? You have to get permission from one of the general partners, and then you have to then get together a group of people to oust the general partner. Doesn't that seem like such an improbable, realistic combination of circumstances? Well, Your Honor, I would not say it's totally improbable, but I would say that giving it a weight of only 25 percent as a likelihood recognizes that it's not highly likely. And I think this Court has said in O'Connell and I think in Sammons that the Court's valuation methodology is entitled and the weighting of factors is entitled to some deference, and so even though it's hard to say 25 percent versus 27 percent or 23 percent, it's not an unreasonable. Didn't the tax court make a finding that there was little, if any, likelihood of anyone wanting to liquidate? Your Honor, I don't think that the tax court found there was little, if any. I think he said it was unlikely, given the state of the record. Well, was there any word of testimony that it was likely that anyone would want to liquidate? I believe what the tax court was doing was properly applying the hypothetical buyer and the hypothetical seller, which was. Where were these experts from that were the witnesses, the expert witnesses that testified about all this valuation formula? The taxpayer's expert is from something called Willamette, something or another, and the IRS's expert is from some concern, a valuation concern in Southern California. Do they know anything about timber? You've got 75 sections of timber in a limited growing season in Oregon, and that's a whole different world. You're talking about real estate. It's not just the – it isn't a publicly owned company where you buy shares and sell shares. This is a testimony of whether there was little likelihood of a sale. So you're talking about a hypothetical market. Well, Your Honor, I would speculate that, in fact, because the tax court gave greater weight to the taxpayer's expert's testimony, perhaps he was acknowledging that there was greater expertise on that expert's part. The court, nonetheless, felt that because that expert gave no weight at all to the value of this partnership's substantial assets, that required correction by the court. And that's where the court looked at the fact that the taxpayer's argument entirely relies on the intent of the partners never to part with this timber land. And the court said, well, a hypothetical seller frequently might prefer cash to an income stream that isn't people- I understand all this hypothetical buyer, hypothetical seller, but I think what you really wanted to figure out as you're trying to value this asset is what would a willing buyer pay for this if someone's willing to sell it? But the structure into which he is buying is by no means hypothetical. You're trying to figure out what are these people going to do in the future. So on the selling side, if I look at the entire structure of the company, it's by no means hypothetical. Well, that's correct, Your Honor, but I believe that's why the tax court tried to go to such great lengths to explain his thinking, which was he understood that at this point in time, the general partners who testified said that they had no interest in parting with any of the assets of the partnership. But, he said, that isn't necessarily what a rational seller would do, and there are other members of this partnership, and there are other ways- But what evidence do we have of others in the partnership who wish to get asset value? Any? There's no evidence either way that they would or they would not. So the only evidence we have is evidence that says we're not going to sell, we're going to continue in the current operation, and you're asking us to think because some of these other limited partners aren't on the stand that they might want to sell? I mean, how are we supposed to conclude that? Because the proper standard here is to look at a rational seller, not a member of this family. And, in fact, if you look at the Watts decision- But I understand the rational seller, but the question is what is the family going to do once the rational buyer has bought? Isn't that right? I'm not sure that is the question here in terms of the value of the interest. Well, no, the question is, is this eventually going to be liquidated, and if so, when? And whether it's going to be liquidated and when depends entirely on the ownership structure and who those people are. That seems to me elementary. That's correct, Your Honor. But there are members of this partnership who are not the two people who testified that they had no interest in asset sales. Now, did you have the ability to call any of the limited partners to the stand and get evidence from them? I presume that we did, yes, Your Honor, although it wasn't our burden to show that this was- So, I mean, I don't think it would be very convincing to me that they might have had a different point of view if you didn't call them and you had the capacity to do so. Your Honor, again, I would fall back on the notion that even though we are talking about two particular people who testified, the court is supposed to look at what the rational seller would do. He doesn't have to hear from a person that he's a rational seller to know that the rational seller typically will appreciate cash. But the rational seller is the decedent who's trying to maximize. But then the rational seller has to deal with the rational buyer, and the rational buyer then has to figure out what he's buying. And what he's buying depends not on the rational seller, but everybody else in the company, because the seller has sold, he's out. That's correct. Could I ask a question about the future life of this case? If we should find that there is speculation and cutting the baby in half type of reasoning by the tax court and remand it for some further finding, why isn't this a good case to settle? All they're going to be talking about is money, and they've already, the tax court has already agreed that there's very little likelihood or no evidence of any future sales and nothing about the market. So those facts might have a bearing on the future life of this case, and that's the kind of case that usually can be settled when the parties find out that you're going to have some more fact-finding. If you ask me if this is a case that could be settled, I would think that it could be, except that the parties are so far apart in terms of their values. There was a finding that there was no willful under-reporting, and there were findings in favor of the taxpayer on many points, so there would be a pretty much down to a dollar evaluation of what is reasonably likely in the event of liquidation. But that could be done. I don't think it's a case that's going to be settled by competent lawyers without too much trouble. When I was a State court judge, I used to have these kind of cases all the time, and they almost always settled. Particularly you get what we had a lot of times, two lumber companies fighting over the valuation of timber. They would almost always settle before we got to the end of the trial, as the facts started to unfold. Your Honor, I don't know what to say about that. The IRS settles a lot of cases. In this case, I think the Commissioner's position was that it's just not sufficient to value this partnership interest in cash flow terms only, and the taxpayer's position was that's all we think is part of the value of this partnership, and we just couldn't meet. Now, I assume you know that we've got a mediation service connected to the court of appeals. Has this been passed through the mediators at all? Your Honor, I don't honestly remember whether we had a meeting with the mediators. Okay. I — because I don't remember, it makes me think we did not, but I'm not sure. Well, I suspect if you don't remember, it didn't happen, because that would be a memorable experience. Let me ask you a different question, which is let's assume that there is a 25 percent chance that in 2040 there would be a selling off of assets, maybe of the entirety of the assets. What should be the valuation now for purposes of tax of this estate? Your Honor, I think that's what was measured by the asset accumulation method that the taxpayer's expert attributed 10 percent value to. I don't think it's a 25 percent chance of a liquidation in 2040. That's when the partnership terminates. Well, of course, but you've got testimony in the record that the general partners say in 2040 we think we want to continue in current — I mean, that's when this agreement terminates, but they've said actually we want to continue after 2040 in the same way, which of course may or may not be true. I mean, family needs change, you know, all kinds of things happen. But there's evidence, whether you take it at face value or discount it somewhat, that they intend to continue in the same fashion even after 2040. I don't believe that anybody has measured the likelihood of the partnership continuing after 2040 at 25 percent. So I really am not sure what impact that has. I was making up that number. I was asking you what if that's so. Your Honor, I honestly am at a loss. If that were the case, like I said, I think that's what the taxpayer's expert measured with his asset accumulation method. He only assigned a 10 percent value to it. If you said 25 percent was the likelihood it was going to happen, I suppose his numbers could be used and adjusted in that way. But he did that and gave it a 10 percent weighting in this equation that he used. The problem I have with the position taken by the government and taken by the tax court is that you've got a company that is being run in what seems to the current owners a perfectly rational way. They're making lots of money. They could make a lot more money in the sense of immediate cash if they sold off, and they could then invest the cash in the stock market. But maybe they think over the long term it's better to have a very secure source of income, less than maybe they could make investing through Bernie Madoff. And maybe they got some notion as to how they think they should be stewards of the land. I have trouble seeing how the IRS can conclude that there's a 25 percent chance that they're going to abandon that. Your Honor, let me say that the IRS's conclusion on that was that it was substantially more likely than 25 percent. That's the tax court's decision of it. And I think that decision is entitled to deference when it was explained as the court's understanding what the family's current intent is. You know, I was on the you probably saw this. I was at a center in Simplot. I did see that. I argued that we should defer to what the tax court said, and that does not seem to be the attitude of this circuit. I have not seen a decision that said it was not the case. That was one of the clearer statements that it is the case, but I don't see that anybody has said that the tax court's findings of value are not entitled to some deference, and that continues to be the case. What would be your position if we were to remand because we're not comfortable with the 25 percent factor here? What would happen then? I'm sorry, Your Honor. Again, I did not understand. Sorry. What would be your position if we were to remand because we are not comfortable with the 25 percent factor? What would you do then? I think the case would have to be retried. I don't see how we could start with the same evidence and persuade the tax court that it needs to arrive at a different conclusion. So there would have to be new. Would you do anything new? Would you provide any additional facts or arguments if that were to happen? I'm just trying to get a realistic sense, if that were to happen, what the position of the Commissioner would be. I don't know what more facts could be presented. Perhaps the testimony of some family member who indicates that he or she has no interest in continuing in this business for very much longer. I have no idea whether that's available. It's a possibility. So I assume there are possibilities for additional facts that could be introduced. I'm just not too sure what they are. Okay. Thank you very much. Now, we took you over, but why don't we put three minutes on the clock? There you are. I'd like to point out that there was absolutely no evidence in the record indicated that anybody was interested in having a liquidation. First of all, the two general partners owned almost 21% of the limited partner interest, and they were very clear in their desire to continue the business and were very happy with the success it enjoyed. On top of that, it was a mother and sisters who owned the rest of the interest. And the testimony of the two general partners were that no limited partner had requested a liquidation. No general partner had requested a redemption. No limited partner had felt that they should sell timberlands in order to generate cash flow. And something that Judge Block would clearly understand, people that live in this area are not interested in investing with Bernie Madoff or in the stock market, and they are stewards of the land. In addition to that, this company developed a 100-year computer plan, which was established to manage all their timberlands into the future. Beyond that, in order to maintain the family values, each year, they had meetings not only of the limited partners, but the next generation to explain what they were doing with the land, explain what their future plans were, and to carry on a tradition that had run almost 100 years. But the limited partners really have a vested interest in trying to keep the estate taxation low. I mean, they're the next people on the food chain, so to speak. They want to make sure that this is a low, low estate tax valuation. Well, I don't think they ran it like it was low. I think they ran it the way these businesses are. I happen to have represented the business. I'm just saying they have a vested interest in testifying in such a way so that there'll be a low estate tax valuation opportunity. Well, I think the question that was asked, though, was there any indication in the evidence that anybody desired to make a sale? And the answer was that they don't. Why would they say yes? Well, you're still governed by state law. And the state law says that you are an assinee. With all due respect to a government attorney, that's what the hypothetical buyer was going to buy, an assinee interest without the right to vote. It's not reasonably foreseeable at all or in the future that there's necessarily going to be a liquidation. Mr. Riley assumed a 100% liquidation at the end of 2040, not 25. But he did what you're supposed to do. He did a present value analysis. He used timber studies that showed that the market would grow at about a 4% per year, and then present value it back and gave it a 10% weight. Let me ask you this. If the tax paid were the tax that the tax court has now asked for, would that in itself create pressure on the limited and general partners to liquidate? No, but it would put them in a position where it would be, I think, significantly damaging to the business, because it's been able to operate without any debt whatsoever. And the significance of this finding would certainly have a negative impact on the business. Well, it may be that the pressure is not very much, but it does seem to me that if the government is asking for cash out of the business, one of the ways businesses respond to demand for cash is they think about selling off part of the business to satisfy the demand. That doesn't change the analysis of what would happen if it's taxed at the rate you think. But what I'm after is whether the government may be engaged in a sort of self-fulfilling prophecy of making it more likely that there's an asset sale by the very fact of the tax that they want. Well, I think it is a self-fulfilling prophecy, because there are many companies out there. And the fact is, in order to operate most timber products companies, they have to have substantial timber lands in order to generate profits from the sale of products. These are not assets held for investment and resale. These are assets held to sell products. And the fact is that most of the many of the businesses that don't have their own timber lands over the last 10 or 15 years have been forced to go out of business. So it's very necessary, but they're not held for resale. We have a hundred-year history here of not selling timber lands to generate cash. Okay. Thank you very much. Thank both sides for very useful arguments.
judges: Block, Goodwin, Fletcher